UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-------------------------------------------------------- x

JACQUES LANGFORD,

               Plaintiff,

           -against-

CITY OF NEW YORK, NYPD OFFICER
BRYAN VAUGHAN, Tax No. 951372, NYPD
OFFICER BRIAN DONOHUE, NYPD
SERGEANT JESSE TERLINSKY, Shield No.
3063, and JOHN/JANE DOE POLICE
OFFICERS 1-4,

              Defendants.

-------------------------------------------------------- x

**COMPLAINT**

Jury Trial Demanded

This is an action to recover money damages arising out of the violation of Plaintiff Jacques Langford's rights under the First, Fourth, Fifth, Sixth and Fourteenth Amendments of the United States Constitution.

## JURISDICTION AND VENUE

1.     This action is brought pursuant to 42 U.S.C. §§ 1983 and 1988, and the First, Fourth, Fifth, Sixth and Fourteenth Amendments to the United States Constitution.

2.     The Court's jurisdiction is predicated upon 28 U.S.C. §§ 1331, 1343.

3.     Venue is proper in the Eastern District of New York under 28 U.S.C. § 1391(b) as Plaintiff resides in the District and the claim arose in the District.

## JURY DEMAND

4.     Plaintiff respectfully demands a trial by jury of all issues in the matter pursuant to Federal Rule of Civil Procedure ("FRCP") 38.

## PARTIES

5.     Plaintiff was a citizen of Queens County in the City of New York at the relevant time and the events described herein occurred in Queens County.

6.     Defendant CITY OF NEW YORK was and is a municipal corporation duly organized and existing under and by virtue of the laws of the State of New York.

7.     Defendant CITY OF NEW YORK maintains the New York City Police Department ("NYPD"), a duly authorized public authority and/or police department, authorized to perform all functions of a police department as per the applicable sections of the aforementioned municipal corporation, the City of New York.

8.     That at all times hereinafter mentioned, Defendants NYPD OFFICER BRYAN VAUGHAN, Tax No. 951372, NYPD OFFICER BRIAN DONOHUE, NYPD SERGEANT JESSE TERLINSKY, Shield No. 3063, and JOHN/JANE DOE POLICE OFFICERS 1-4 (hereinafter collectively "Individual Defendants"), were duly sworn members of the NYPD and were acting under the supervision of said department and according to their official duties.

9.     That at all times hereinafter mentioned the Defendants, either personally or through their employees (including those supervised and directed by Individual Defendants), were acting under color of state law and/or in compliance with the official rules, regulations, laws, statutes, customs, usages and/or practices of the State or City of New York.

10.     Each and all of the acts of the Individual Defendants alleged herein were committed by said Defendants while acting within the scope of their employment by Defendant City of New York.

## FACTS

11.     On or about the evening of August 15, 2015, Plaintiff was driving with a group of friends—Rosa Colasso, Dennis Bonilla and Eric Bonilla—near the corner of 99th Street and Astoria Boulevard in Queens County.

12. At the relevant time, Plaintiff worked at a DIY store where his job responsibilities there included loss prevention. Pursuant to those duties Plaintiff was licensed by New York State to perform security-guard functions.

13. A group of Individual Defendants (on information and belief, Vaughan and Donohue were line officers with Terlinsky supervising) were in plainclothes and in an unmarked police vehicle when they pulled up next to Plaintiff's vehicle at a traffic light and indicated to Plaintiff through his open window that he should pull over.

14. Plaintiff complied with this group of Individual Defendants' instruction although they had no reasonable cause or suspicion that gave them authority to stop Plaintiff's vehicle.

15. When Individual Defendants approached Plaintiff after he complied with their instruction to pull over, Plaintiff had fully stopped and turned off his vehicle, and he provided his papers as Defendants requested. Plaintiff inquired on what authority the Defendants stopped his vehicle and detained him and his passengers. Defendants expressed annoyance at this inquiry and refused to answer.

16. After Individual Defendants determined that Plaintiff's papers came back "clean" and provided no independent basis for the unlawful stop and detention, Defendants continued to detain and search Plaintiff and his vehicle.

17. Defendants ordered Plaintiff and his passengers out of Plaintiff's vehicle. They unlawfully searched Plaintiff and Plaintiff's vehicle and found no contraband that it was unlawful to possess.

18. Defendants did find a common folding knife which Plaintiff used at work. Individual Defendants knew that this was a common folding knife and that Plaintiff was in lawful possession of it. This was because one of the Individual Defendants examined it and

3

confirmed that it was a common folding knife and did not meet the statutory definition of a "gravity knife."

19.     Certain members of the group of Individual Defendants who will be identified in discovery (which group by now also included, on information and belief, Doe Individual Defendants arriving separately on the scene), acknowledged aloud that the common folding knife was lawful to possess for the above-stated reasons.

20.     Individual Defendants interrogated Plaintiff on the scene (and also later at the precinct) if he had knowledge regarding offenses about which he had no knowledge and about which they had no suspicion or cause to believe that he did.   Individual Defendants did not notify Plaintiff about his rights to have an attorney present for or to remain silent in the face of such questioning.

21.     Plaintiff made no statements giving rise to suspicion or cause to search or arrest, instead responding by continuing to ask on what authority the stop and detention was based, as Plaintiff knew the stop and detention to be unlawful.   Defendants continued to refuse to answer.

22.     An Individual Defendant (on information and belief, this was supervising Defendant Terlinsky) nonetheless instructed other Individual Defendants to search Plaintiff's vehicle further.   They did, despite knowing that this was unprivileged law enforcement action and despite having a reasonable opportunity to halt the continued and even new violations of Plaintiff's rights.  The search revealted no unlawful contraband again.

23.     Individual Defendants then applied too-tight handcuffs on Plaintiff for unlawful possession of a "gravity knife" knowing full well that the item they recovered from the vehicle— a common folding knife—did not meet the statutory definition to provide cause for Plaintiff's arrest.  Not only were the handcuffs too-tight.  Not only was this excessive under the circumstances and Plaintiff's compliance, but their application was unprivileged force in the first

4

instance because Individual Defendants were in possession of no facts that could support a belief that Plaintiff had committed any offense justifying the physical seizure of his person at all.

24.     As a result of the too-tight handcuffs for which Individual Defendants had no privilege to apply in the first instance, Plaintiff experienced pain and discomfort in his wrists for a number of days thereafter.

25.     Individual Defendants then transported Plaintiff to the Precinct for arrest processing without cause and further interrogation without cause.

26.     Individual Defendants fingerprinted, photographed and subjected Plaintiff to other arrest processing at the precinct.

27.     At the precinct, Individual Defendants continued their interrogation of Plaintiff regarding offenses which bore no relationship to even their fabricated basis of Defendants' unlawful stop, search and arrest of Plaintiff.   Individual Defendants' continued interrogation of Plaintiff continued without due advisement of his rights.

28.     While at the precinct, an Individual Defendant acknowledged to Plaintiff that there was no basis for the arrest, but indicated that another Individual Defendant had directed Plaintiff's arrest all the same.  Again, on information and belief the arresting Defendant was either Donohoe or Vaughan, and the Individual Defendant who, on information and belief, was supervising Defendant Terlinsky.

29.     Some hours after Individual Defendants' initial unlawful stop of Plaintiff's vehicle (leading to all subsequent rights violations), Individual Defendants released Plaintiff from the precinct with a Desk Appearance Ticket charging him with a Class A misdemeanor for having been found in possession of a gravity knife, which was false, and Plaintiff's vehicle was returned to Plaintiff there.  The supervising Defendant approving the knowingly unlawful arrest was, on information and belief, the same supervising Defendant who directed it.

5

30.     Within days of Plaintiff's false arrest, he received correspondence from NYS's Division of Licensing Services notifying him that they had learned that Plaintiff was charged with an offense which, if not resolved, could result in the loss of his security-guard license.

31.     This threat to Plaintiff's livelihood caused him considerable distress pending his DAT return date on the fabricated arrest charges, and also as he made court appearances to resolve the matter before its ultimate dismissal.

32.     Plaintiff learned at his appearance in state court that Individual Defendants also forwarded fabricated evidence and/or false statements against him to the DA's Office regarding not only his possession of a "gravity knife" which was only a common folding knife, but also regarding traffic violations that Plaintiff did not commit to commence related criminal proceedings against him.  Plaintiff alleges that Individual Defendants did this maliciously to retaliate against him for inquiring about their authority for the unlawful stop, seizure, searches, arrest and undue force, and to cover up the fact that there was no cause for the stop, detention, searched or arrest.

33.     Individual Defendants forwarded all fabricated evidence and false statements to prosecutors to commence the baseless gravity-knife charges and traffic-violation offenses to justify the unlawful stop, searches, arrest and undue force, and in order to retaliate against Plaintiff for inquiring about their constitutional authority for the same.

34.     In reliance upon the fabricated evidence and/or false statements that Individual Defendants forwarded to the DA's Office in connection with the incident, the DA's Office charged Plaintiff with related offenses that in fact had no factual foundation.  On information and belief, Defendants also omitted material information from their submission to prosecutors which was material to whether there was cause to commence and/or continue criminal proceedings against Plaintiff.   The DA's Office also relied upon Defendants' material omissions.

35.     Plaintiff complained to the NYPD and CCRB regarding the unlawful stop, searches, arrest and undue force. Plaintiff later received information from CCRB that the agency substantiated some of Plaintiff's rights-violation allegations against at least one of the Individual Defendants and imposed related discipline against him in the form of formalized training. While Plaintiff was notified that other government investigation into his complaints were underway, at this writing those other misconduct-complaint investigations did not result in the disclosure of findings and dispositions to Plaintiff.

36.     On information and belief, some of the information which CCRB found to be true and supportive of Plaintiff's substantiated misconduct allegations against the Individual Defendants was never disclosed by Defendants to the DA's Office despite the fact that it contradicted fabricated evidence that Individual Defendants had forwarded to the DA's Office to commence criminal proceedings against Plaintiff, and despite the fact that it was material and exculpatory.

37.     All of the above occurred as a direct result of the unconstitutional policies, customs or practices of the City of New York, including, without limitation, the inadequate screening, hiring, retaining, training and supervising of its employees, and due to a custom, policy and/or practice of: detaining innocent persons without cause in order to meet "productivity goals," or arrest quotas; detaining individuals for professional advancement, overtime compensation, and/or other objectives outside the ends of justice; and/or manufacturing false evidence against individuals in an individual effort and also in a conspiracy to justify their abuse of authority in falsely arresting those individuals.

38.     The unconstitutional policies alleged herein include deficiencies in the City Defendant's law-enforcement officer training relating to what facts give rise to constitutional

privilege for law enforcement to stop vehicles, to frisk and search individuals without a warrant, and to search vehicles without a warrant.

39.     The unconstitutional policies alleged herein include deficiencies in the City Defendant's law-enforcement officer training relating to what facts give rise to constitutional privilege to arrest and commence criminal proceedings against a person for unlawful possession of a gravity knife.  These deficiencies include, but are not limited to, deficiencies in the substance of the training, the frequency with which it is provided to officers, and whether the training is followed by some verification that trained officers properly understood and/or retained the information necessary to identify when a knife meets the statutory definition of a "gravity knife."

40.     The unconstitutional policies alleged herein include the City Defendant's failure to take steps to address obvious risks that law-enforcement officers would cause members of the public to suffer unprivileged gravity-knife arrests/prosecutions and unreasonable fabrication of evidence regarding gravity-knife possession despite having been placed on notice of the same. Plaintiff alleges that at all relevant times the City Defendant had notice of the risks of false gravity-knife arrests given (1) the comparatively high number of offense-charge dismissals arising from gravity-knife arrests vis-à-vis other kinds of arrests; (2) the comparatively high number of claims and litigations brought to challenge gravity-knife-related false-arrest, malicious-prosecution and evidence-fabrication claims as compared to the number of claims and litigations arising from arrests charging other kinds of offenses; and (3) government and third-party reporting and data collection regarding the frequent misidentification of common-folding knives as gravity knives when they do not meet the latter's statutory definition, and the risk of false arrest and undue prosecution that such misidentifications pose.[1]

---

[1] See, e.g., Danielle Haley, So-Called Gravity Knives: NY Law Balances on a Thin Edge, Harvard Law & Policy

41.     The unconstitutional policies alleged herein also include the City Defendant's failure to take adequate steps to develop a system or policy whereby its investigators and/or investigative agencies (including but not limited to CCRB, IAB, precinct-level investigators, and more) fail to timely share data they have collected and substantiated findings regarding a subject arrest/prosecution with the relevant DA's Office despite knowing that that prosecutors and defense counsel would find the information and/or findings relevant, material and/or even exculpatory for the accused.   As a result of the City Defendant's failure to have an information-sharing policy to achieve timely communication of information/findings relevant to an accused's arrest/prosecution, the City Defendant caused the <u>Brady</u> violation complained of by Plaintiff here because relevant/material/exculpatory information/findings relating to Plaintiff's case were not shared with relevant prosecutors in timely fashion and therefore caused the continuation of criminal proceedings against him beyond the time it would have otherwise occurred.

42.     With respect to the specifically Named Individual Defendants in this case, the Defendant City's knowledge of prior incidents in which they were involved in unprivileged stops, detentions, searches, arrests and prosecutions was such that the Defendant City was on notice that, barring additional training, discipline and/or supervision, the Individual Defendants would violate other individuals' constitutional rights going forward, which they did to Plaintiff here.   The prior incidents include, but are not limited to, the number and substance of other misconduct allegations made to and investigated by precinct-level, borough-level, department-level and municipal-level bodies, including but not limited to CCRB, IAB,

---

Review, Nov. 7, 2017, at http://harvardlpr.com/2017/11/07/so-called-gravity-knives-new-york-law-balances-on-a-thin-edge/ (last accessed May 29, 2018); Dan Quart & Tina Luongo, Reform NY's Antiquated, Discriminatory Gravity-Knife Law, Crain's NY Business, June 16, 2017, at http://www.crainsnewyork.com/article/20170616/OPINION/170619923/reform-new-yorks-antiquated-discriminatory-gravity-knife-law (last accessed May 29, 2018); NY Times Editorial Board, NY's Outdated Knife Law, NY Times, May 31, 2016, at https://www.nytimes.com/2016/05/31/opinion/new-yorks-outdated-knife-law.html (last accessed May 31, 2018).

borough/precinct/division/unit integrity officers, and more, and the findings made and actions taken by the same relative to these Individual Defendants. In addition, the Defendant City's knowledge that prior incidents reasonably required additional training, supervision and/or discipline for these Individual Officers is demonstrated by the number, substance and resolution of misconduct allegations made against these Individual Defendants in pre-litigation notices of claim and litigation pleadings. The prior incidents also include instances where allegations of unlawful stops, detention, searches and more were successfully litigated against the Individual Defendants in the context of criminal prosecutions to suppress evidence or statements.[2]

43.     To the extent the City Defendant purports to have a policy designed to adequately observe patterns of individual-officer misconduct to identify when training, discipline and/or supervision of a particular officer is required to protect the general public and/or its individual members from future rights violations by that officer, Plaintiff alleges that the policy does not operate to adequately identify and address patterns as it purports to do. Among other reasons, this is because the method by which the City allegedly implements the policy is paper-based, fails to centralize misconduct allegations made to various investigative bodies (CCRB, IAB and/or department/borough/precinct/unit/division integrity control officers) in any one place, fails to merge the dispositions of misconduct-allegation investigations—or even the most basic factual allegations relating to the complaint—onto individual investigative bodies' indices designed for that purpose, and more. In summary, the City purports to have a reasonable and sincere policy meant to allow it as a modern managerial authority to meaningfully track

---

[2] See, e.g., Using Data from Lawsuits and Legal Claims Involving NYPD to Improve Policing, OIG NYPD Report, April 2015; NYPD Response, June 20, 2015, at https://www1.nyc.gov/site/oignypd/reports/reports.page (last accessed May 29, 2018); see also Ongoing Examination of Litigation Data Involving NYPD, OIG NYPD Report, April 30, 2018, at http://www1.nyc.gov/site/doi/offices/oignypd.page (April 30, 2018).

troublesome patterns of risk in its employees, but the policy does not come close to sincerely permitting the City to achieve that goal.[3]

44.     The City's inefficient, insincere and therefore deliberately indifferent approach to detecting its employees' pattern-based risks of future commissions of constitutional-rights violations is further demonstrated by its failure to perform any investigation or by its performance of an insufficient investigation into officer-misconduct allegations when made. Even assuming arguendo that the City had a way to meaningfully track the substance, frequency and relative similarities and merit of misconduct allegations leveled against a particular officer during the history of his/her municipal employment, the City Defendant so often fails to perform any investigation or any sufficient investigation into officer-misconduct allegations. The same City Defendant that purports to have a policy of looking for misconduct patterns evincing risks that its personnel will commit constitutional violations against people going forward lacks a regular mechanism through which to verify that a misconduct allegation—whether made by a member of the service or a member of the public—was investigated at all or with a modicum of seriousness by a responsible government actor at unit, division, precinct, borough, agency, municipal or other level.   Accordingly even if the City has a more systematic misconduct-pattern-detection policy or system in place, which Plaintiff alleges the City does not, the hypothetical policy or system would in practice be inadequate without the raw material (i.e., meaningful individual misconduct allegation investigations) necessary for such pattern-detection efforts to work.[4]

---

[3] See, e.g., Addressing Inefficiencies in NYPD's Handling of Complaints, OIG NYPD Report, Feb. 7, 2017; NYPD Response, May 8, 2017, at https://www1.nyc.gov/site/oignypd/reports/reports.page (last accessed May 29, 2018).
[4] See, e.g., Addressing Inefficiencies in NYPD's Handling of Complaints, OIG NYPD Report, Feb. 7, 2017; NYPD Response, May 8, 2017, at https://www1.nyc.gov/site/oignypd/reports/reports.page (last accessed May 29, 2018).

45.     Another way in which the City's officer-misconduct-complaint investigation practices exhibit deliberate indifference to the detection of patterns requiring managerial response to protect against future rights violations because even agency-specific misconduct-allegation indices fail to offer any clear way to quickly synthesize a picture of a subject officer's historical patterns of misconduct allegations, related investigative findings and municipal action. For example, CCRB and IAB and lower-level integrity-control misconduct-allegation and investigative records are maintained separately from one another and not merged into one central document. As another example, in many instances an integrity-control entity's records specific to that entity fails to serve as meaningful quick-reference records for anything because the substantive detail of a misconduct complaint, whether it was ever investigated, its ultimate resolution, and more are never centralized anywhere. Setting aside the intra-entity inefficiency occasioned by this approach, this approach also assured inter-agency inefficiency in detecting officer-specific misconduct-allegation and misconduct-investigation patterns as they may be demonstrated through a holisitic and complete review of various integrity-control entities' work.

46.     The City's officer-misconduct-complaint investigation practices further fail to fully address pattern-derived obvious risks that an officer will violate other individuals' rights in the future because relevant municipal policy contemplates only that officers accused of independently initiated and direct misconduct should be treated as having the potential for demonstrating patterns of misconduct rising to the level of constitutional risk. This ignores that supervisory officers who are implicated in issuing unconstitutional directions to subordinates or who are implicated in incorrectly approving subordinates' unconstitutional arrests or other actions can demonstrate equivalent pattern-derived constitutional risks as is true for patterns that are noted in a direct officer offender. The same is true that subordinate officers who are regularly implicated in failing to intervene to stop a colleague's or supervisor's unconstitutional

actions can pose a problematic pattern-derived risk of constitutional damage to the public. Yet the City's misconduct-allegation investigation policy does not squarely address officers' involvement in supervisory or failure-to-intervene rights violations with the same equivalence as direct violations despite the fact that a reasonable managerial authority would treat them, when tracked, as able to similarly establish notice of future constitutional-violation risks.

47.     The City's unconstitutional customs and policies which may be inferred from repeated occurrences of similar wrongful conduct as discussed above is also documented in civil rights actions filed in the United States District Courts in the Eastern and Southern Districts of New York, New York State courts, and Notices of Claim filed with the Comptroller's Office. The City is on clear notice that its policies and customs have caused and continue to cause chronic constitutional violations from (1) the number of Civil Rights Lawsuits filed against it and its law enforcement officers (which, on information and belief, the City does not adequately track in order to identify problem precincts, divisions, units and/or problem officers), (2) the number of Notices of Claim ("NOC") filed against the City and its law enforcement officers and the City's inadequate responses to those NOCs, (3) the number of Complaints filed with the Civil Complaint Review Board ("CCRB") against the City's law enforcement officers, (4) City Council hearings, (5) newspaper reports, (6) criminal cases resulting in declined prosecutions and dismissals, (7) judicial rulings suppressing evidence and finding officers incredible as a matter of law; and more. Taken together, all of these red flags demonstrate that a troubling number of NYPD officers unlawfully stop, search and seize New Yorkers without reasonable suspicion or probable cause, bring charges against New Yorkers with no legal basis, perjure themselves in charging instruments and through testimony, use excessive force against individuals, and fail to intervene in and report the obviously illegal actions of their fellow officers, inter alia.

13

48.     Policymaking officials of the City and NYPD implemented plainly inadequate policies, procedures, regulations, practices, and customs, including but not limited to the following: 1) arresting persons known to be innocent in order to meet "productivity goals"; 2) falsely swearing out criminal complaints and/or lying and committing perjury during sworn testimony to protect other officers and meet "productivity goals"; 3) failing to supervise, train, instruct and discipline police officers thereby encouraging their misconduct and exhibiting deliberate indifference towards the constitutional rights of persons within the officers' jurisdiction; 4) discouraging police officers from reporting the corrupt or unlawful acts of other officers; 5) retaliating against officers who report police misconduct; and 6) failing to intervene to prevent the above-mentioned practices when they reasonably could have been prevented with proper supervision. By failing to properly train, supervise and discipline its employees, agents, and servants, the City effectively encourages illegal, immoral, and unprofessional behavior.

49.     Former Deputy Commissioner Paul J. Browne, as reported in the press on January 20, 2006, stated that NYPD commanders are permitted to set "productivity goals," permitting an inference of such a custom or policy encouraging deprivations of individuals' constitutional rights in cases such as this one.

50.     Defendant City of New York is thus aware that its improper training and customs and policies have often resulted in a deprivation of individuals' constitutional rights. Despite such notice, Defendant City of New York has failed to take corrective action. This failure caused Individual Defendants in this case to violate Plaintiff's constitutional rights. For decades, the City has been on notice that certain precincts and certain police officers are disproportionately responsible for civil rights lawsuit liability. Nonetheless, the City has failed to take action to track such information in order to hold precincts or officers accountable through disciplinary action or programs of reform. See, e.g., Wyatt v. Cole, 504 U.S. 158, 161 (1992)

14

("The purpose of § 1983 lawsuits is to deter state actors from using the badge of their authority to deprive individuals of their federally guaranteed rights and to provide relief to victims if such deterrence fails.").

51.     One of the more recent examples of the City failing to make use of Civil Rights Lawsuit data to improve law enforcement's record vis-à-vis the protection of individuals' rights occurred in 2014 when the City Council considered whether the NYPD should have to produce quarterly reports about complaints against the department.  Among other things, the reports would indicate whether an officer who was the subject of a complaint had "previously been the subject of a civil action or actions alleging police misconduct" so that tailored attention could be given to an open and obvious existing and/or developing problem.  See Azi Paybarah, Council Seeks Regular Reports On NYPD Complaints, May 5, 2014, at http://www.capitalnewyork.com/article/city-hall/2014/05/8544832/council-seeks-regular-reports-nypd-complaints (last accessed May 29, 2018).

52.     NYPD Commissioner Bill Bratton publicly opposed these reporting requirements. In June 2015, Commissioner Bratton stated that "[r]ather than enacting a set of reporting bills that impose information-sharing as a mandate, [the NYPD and the City Council] should sit down together and work out how relevant information may be shared, taking into account the manner in which the information is collected and maintained—and our available resources." See New York Police Department Commissioner William Bratton, Statement Before The New York City Council Public Safety Committee, June 30, 2015, at http://nypdnews.com/2015/06/police-commissioner-brattons-statement-before-the-new-york-city-council-public-safety-committee/ (last accessed May 29, 2018).

53.     The City's failure to compile and employ Civil Rights Lawsuit data in this manner is surprising when one considers the trove of data that this represents.  For example,

between 2009 and 2014, the City paid an average of $33,875 per case to resolve well over 10,000 cases. See Caroline Bankoff, The City Has Paid Almost Half a Billion Dollars in NYPD-Related Settlements Over the Past 5 Years, Oct. 12, 2014, available at:

http://nymag.com/daily/intelligencer/2014/10/428-million-in-nypd-related-settlements-paid.html

(last accessed May 29, 2018). Similarly, the City Comptroller has reported that the City of New York's payments to resolve allegations of misconduct by members of the NYPD has risen from $99 million to $217 million in between 2005 and 2014. While such numbers relate to the NYPD as a whole, they reflect that the City had actual knowledge that its police department was routinely engaging in unconstitutional and unlawful conduct. See Office of the Comptroller, Claims Report: Fiscal Years 2013 and 2014, August 2015, available at

http://nylawyer.nylj.com/adgifs/decisions15/083115claims.pdf (last accessed May 31, 2018).

54.     In 2009, the City Council noted that study of a large number of cases might well reveal patterns of misconduct against which the NYPD could and should take systematic management action, but again, this elicited no significant change in the City's methods. See Christopher Dunn and Robert Perry, Reporting By The New York City Corporation Counsel On Civil Damage Claims Related To Police Misconduct, Dec. 11, 2009, at

http://www.nyclu.org/content/reporting-new-york-city-corporation-counsel-civil-damage-claims-related-police-misconduct (last accessed May 29, 2018).

55.     By failing to keep track of crucial data, which could save lives as well as taxpayer money, the City has created a system in which lawsuits are treated as unrelated to their potential deterrent effect.

56.     The City is also on notice that it employs policies and practices which are presently insufficient to identify law enforcement's chronic violations of individuals' civil rights because recent Civil Rights Lawsuits and Criminal Prosecutions amply document systemic

16

problems which the NYPD resists addressing, as evidenced by its opposition to reporting

protocols and officer recidivism analyses.  By way of example,

a. In Schoolcraft v. City of New York, 103 F. Supp. 3d 465 (S.D.N.Y. 2015), the Court found that evidence showed an issue of fact as to whether the City had a custom of retaliation against whistle blowers.  Among the record evidence was expert witness testimony about a "blue wall of silence," which is a "police culture that prizes intense loyalty, unity and solidarity among police officers to the extent that any officer reporting the wrongdoing of another officer would be in violation of the code and subject to retaliation."  In addition, IAB-run focus groups had revealed that "physical fear surfaced several times [in participants] during the discussion on reporting corruption."

b. In Colon v. City of New York, No. 09 Civ. 0008 (JBW), 2009 WL 4263362, at *2 (E.D.N.Y. Nov. 25, 2009), the Court denied the City's motion to dismiss the civil rights plaintiff's Monell claim against it for insufficient pleading, finding that:

> Informal inquiry by the court and among the judges of this court, as well as knowledge of cases in other federal and state courts, has revealed anecdotal evidence of **repeated, widespread falsification by arresting police officers of the New York City Police Department**.  Despite numerous inquiries by commissions and strong reported efforts by the present administration—through selection of candidates for the police force stressing academic and other qualifications, serious training to avoid constitutional violations, and strong disciplinary action within the department—**there is some evidence of an attitude among officers that is sufficiently widespread to constitute a custom or policy by the city approving illegal conduct of the kind now charged.**

(emphasis added).  In response, NYPD Commissioner Raymond Kelly said that when this misconduct "happens, it's not for personal gain. It's more for convenience."  See Loren Yaniv and John Marzuli, Kelly Shrugs Off Judge Who Slammed Cops, New York Daily News, December 2, 2009, available at http://www.nydailynews.com/news/crime/police-commissioner-kelly-shrugs-judge-slammed-cops-article-1.433710.

c. In People v. Arbeeny, Index No. 6314-2008 (N.Y. Sup. Ct., Kings County), former undercover NYPD narcotics officer Steve Anderson testified about the frequency with which he observed a law enforcement officer planting narcotics on a suspect in order to make an arrest that would held the officer meet his or her monthly quota of arrests.  In order to achieve this, according to Anderson, an officer

would carry a stash of narcotics to plant on innocent civilians, a practice that he called "attaching bodies." According to Anderson,

> It was something I was seeing a lot of, whether it was from supervisors or undercovers and even investigators. Seeing it so much, it's almost like you have no emotion with it. The mentality was that they attach bodies to it, they're going to be out of jail tomorrow anyway, nothing is going to happen to them anyway. That kind of came to me and I accepted it – being around so long, and being an undercover.

See, e.g., John Marzulli, We Fabricated Drug Charges Against Innocent People To Meet Arrest Quotas, Former Detective Testifies, Oct. 13, 2011, at http://www.nydailynews.com/ crime/fabricated-drug-charges-innocent-people-meet-arrest- quotas-detective-testifies-article-1.963021 (last accessed May 29, 2018); Jim Dwyer, The Drugs? They Came From The Police, Oct. 13, 2011, at http://www.nytimes.com/2011/10/ 14/nyregion/_those-drugs-they-came-from-the-police.html?_ R=0 (last accessed May 26, 2016).

In response to the testimony, the presiding judge, New York Supreme Court Justice Gustin Reichbach stated

> Having been a judge for 20 years, I thought I was not naïve regarding the reality of narcotics enforcement. But even the Court was shocked, not only by the seeming pervasive scope of the misconduct, but even more distressingly by the seeming casualness by which such conduct is employed.

d. In People v. William Eiseman, Index No. 2999-2010 (N.Y. Sup. Ct., New York County), NYPD Sergeant William Eiseman pled guilty to perjury and falsifying police records, admitting to faking a marijuana case against one man and cocaine-related charges against another – and training subordinate officers to falsify paperwork to sidestep legal safeguards. See, e.g., NYPD Sgt. William Eiseman Pleads Guilty To Lying Under Oath In Plea Deal, New York Daily News, June 27, 2011, at http://www.nydailynews.com/news/crime/nypd-sgt-william-eiseman- pleads-guilty-lying-oath-plea-deal-article-1.129288 (last accessed May 29, 2018).

a. In or around 2007, the United States Attorney's Office investigated the 109th precinct of the NYPD for "planting drugs on suspects and stealing cash during gambling raids." The 109th precinct is believed to be involved in a practice known as "flaking" wherein police officers plant drugs on suspects in order to bring legitimacy to the arrest. According to the Assistant United States Attorney Monica Evans, members of the 109th Precinct "maintained a small stash of drugs in an Altoids tin for this purpose." John Marzulli, Claims of Corruption in Kings

Precinct Put Crooked Cop's Sentencing on Hold, N.Y. Daily News, June 20, 2008, available at http://www.nydailynews.com/news/crime/claims-corruption-Kings-precinct-put-crooked-sentencing-hold-article-1.296352 (last accessed May 29, 2019).

e. In late 2009, a former NYPD officer in the Bronx, Pedro Corniel, was charged with perjury for claiming to have caught a burglar "red-handed" when, in fact, two other officers had made the arrest and handed the arrest off to Corniel. In connection with the incident, it was revealed that as many as two dozen similar cases had come to light in the preceding year.

> That is a significant increase over previous years, sources said. "In the past, we'd find this happening once or twice a year, and now there are a bunch of them," said one law-enforcement official.

> What has authorities particularly troubled is that officers historically lied to cover up more serious corruption, such as the cadre of Brooklyn narcotics cops caught stealing drugs from dealers and masking their thievery by filing false reports about what they had seized.

See Murray Weiss, NYPD In A Liar Storm, N.Y. Post, Oct. 26, 2009, at http://www.nypost.com/p/news/local/nypd_in_a_liar_storm_qazMBEm3UNJVog v4Ndeqcl (last accessed May 26, 2016).

f. In Bryant v. City of New York, Index No. 22011/2007 (N.Y. Sup. Ct., Kings County), a jury found that the NYPD had a policy "regarding the number of arrests officers were to make that violated [the] plaintiff's constitutional rights and contributed to her arrest." See Despite Laws and Lawsuits, Quota-Based Policing Lingers, NPR News, April 4, 2015, https://www.npr.org/2015/04/04/395061810/despite-laws-and-lawsuits-quota-based-policing-lingers (last accessed May 29, 2018).

g. In MacNamara v. City of New York, No. 04 Civ. 7922 (RJS) (JCF) (S.D.N.Y), Docket No. 542, the Court granted the Plaintiffs' motion to approve a class-wide settlement reached in a case demonstrating evidence that police officers systematically perjured themselves in sworn statements in order to justify the unlawful mass arrests of 1,800 demonstrators during the 2004 Republican National Convention.

h. In White-Ruiz v. City of New York, 983 F. Supp. 365, 380 (S.D.N.Y. 1997), the Court stated that it found the Mollen Commission's July 7, 1994 report investigating "Allegations of Police Corruption and the Anti-Corruption Procedures of the Police Department" to be "entirely reliable." Among other things, the Mollen Commision reported that NYPD "[o]fficers who report misconduct are ostracized and harassed; become targets of complaints and even physical threats; and are made to fear that

they will be left alone on the streets in a time of crisis. This draconian enforcement of the code of silence fuels corruption because it makes corrupt cops feel protected an invulnerable."

 i. In <u>Ariza v. City of New York</u>, No. 93 Civ. 5287 (CPS), 1996 WL 118535, at *6 (E.D.N.Y. Mar. 7, 1996), the Court denied the defendants' summary judgment motion on the question of whether the City had a custom of retaliation against police corruption whistle blowers, stating that a reasonable jury could plausibly find that the plaintiff's evidence "establishes both a widespread usage and a failure to train in the police department."

57. These cases are but a small drop in the ocean of Civil Rights Cases, Claims, Criminal Prosecutions, and revelations made in these contexts which support that the NYPD has been shown over and over to have a culture of unconstitutional customs and practices, specifically with regard to the a culture of officers lying under oath, falsely swearing out criminal complaints or otherwise falsifying or fabricating evidence, and covering for one's colleagues when they engage in this misconduct, resulting in individuals suffering false arrest, false imprisonment, malicious prosecution, and other constitutional torts.

58. It is thus manifestly clear through the litigation brought in federal and state courts in the City that even if the City was not the intentional architect of polices and routinized conduct causing chronic violations of individuals' constitutional rights, it was certainly on notice of the practice. By failing to take any meaningful corrective steps and instead choosing to put out fires whenever they break out (which is often), the City has ratified, endorsed, and otherwise communicated its acceptance of these policies and customs to the officers it employs.

59. The City's opposition to or refusal to consider adopting more robust data collection, analysis and reporting practices, despite knowing those practices' benefits, has been longstanding.

60. Moreover, on information and belief, and in addition to the Defendant City's lack of an appropriate systematic approach to such problems, Defendant City was also aware, prior to

the incident, that the Individual Defendants named here lacked the objectivity, temperament, maturity, discretion and disposition to be employed as police officers. Despite such notice, Defendant City of New York has retained these officers, and failed to adequately train and supervise them.

61. All of the aforementioned acts of Defendants, their agents, servants and employees were carried out under color of state law.

62. All of the aforementioned acts deprived Plaintiff of the rights, privileges and immunities guaranteed to citizens of the United States by the First, Fourth, Fifth, Sixth and Fourteenth Amendments to the United States Constitution, and in violation of 42 U.S.C. § 1983.

63. The acts complained of were carried out by the aforementioned Individual Defendants in their capacities as police officers, with the entire actual and/or apparent authority attendant thereto.

64. The acts complained of were carried out by the aforementioned Individual Defendants in their capacities as police officers, pursuant to the customs, usages, practices, procedures and the rules of the Defendant City of New York and the NYPD, all under the supervision of ranking officers of said department.

65. Defendants, collectively and individually, while acting under color of state law, engaged in conduct that constituted a custom, usage, practice, procedure or rule of the respective municipality/authority, which is forbidden by the United States Constitution.

66. As a result of the foregoing, Plaintiff is entitled to compensatory and punitive damages in an amount to be fixed by a jury, plus reasonable attorneys' fees, costs and disbursements of this action.

## FIRST CLAIM
## 42 U.S.C. § 1983

67.     Plaintiff repeats and re-alleges each of the preceding allegations contained in this Complaint with the same force and effect as if fully set forth herein.

68.     Defendants, by their conduct toward Plaintiff alleged herein, violated Plaintiff's rights guaranteed by 42 U.S.C. § 1983 and the First, Fourth, Fifth, Sixth and Fourteenth Amendments to the Constitution of the United States.

69.     Defendants' unlawful actions, which were committed under color of state law, were done willfully, knowingly with malice and with the specific intent to deprive Plaintiff of his constitutional rights.

70.     As a direct and proximate result of Defendants' unlawful conduct, Plaintiff sustained the damages hereinbefore alleged.

## SECOND CLAIM
## EXCESSIVE FORCE

71.     Plaintiff repeats and re-alleges each of the preceding allegations contained in this Complaint with the same force and effect as if fully set forth herein.

72.     Individual Defendants violated the Fourth and Fourteenth Amendments because they used unprivileged and excessive force upon Plaintiff during the course of his arrest through the application of handcuffs that were unnecessarily tight and which, given the lack of privilege for the stop, searches, arrest, etc., were unlawfully applied in the first instance.

73.     The level of force employed by Individual Defendants was excessive, objectively unreasonable and otherwise in violation of Plaintiff's Fourth Amendment and Fourteenth Amendment rights.

74.     This caused Plaintiff to suffer physical injury.

75. Defendants' unlawful actions, which were committed under color of state law, were done willfully, knowingly, with malice and with the specific intent to deprive Plaintiff of his constitutional rights.

76. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff sustained the damages hereinbefore alleged.

## THIRD CLAIM
## UNLAWFUL STOP AND SEARCH

77. Plaintiff repeats and re-alleges each of the preceding allegations contained in this Complaint with the same force and effect as if fully set forth herein.

78. Individual Defendants violated Plaintiff's Fourth and Fourteenth Amendments because they stopped, seized and searched him and his vehicle without suspicion, cause or any privilege whatsoever.

79. Defendants' unlawful actions, which were committed under color of state law, were done willfully, knowingly, with malice and with the specific intent to deprive Plaintiff of his constitutional rights.

80. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff was subjected to the unlawful stop, seizure and search of his person and property as hereinbefore alleged, and suffered related injury.

## FOURTH CLAIM
## FIRST AMENDMENT RETALIATION

81. Plaintiff repeats and re-alleges each of the preceding allegations contained in this Complaint with the same force and effect as if fully set forth herein.

82. As herein alleged, it was due to Plaintiff's constitutionally-protected questioning of Defendants' authority for what was an unlawful law enforcement stop, seizure, search and

arrest that motivating Defendants to fabricate evidence and make false statements against Plaintiff, and to falsely arrest him.

83.    Plaintiff contends that his questioning of Defendants' authority for what Plaintiff perceived to be and identified to Defendants as unlawful government action was respectful and that Defendants had no cause to take any of the action against him that they did unless it was motivated in whole or in part by speech-based retaliation.

84.    Defendants' unlawful actions, which were committed under color of state law, were done willfully, knowingly, with malice and with the specific intent to deprive Plaintiff of his  constitutional rights.

85.    As a direct and proximate result of Defendants' retaliation against Plaintiff for his protected speech, Plaintiff suffered injury of his First Amendment rights as well as other constitutional rights which Defendants abrogated with punitive aim.  Defendants did this to chill Plaintiff's speech as he engaged in it, to chill Plaintiff's further speech, and to chill Plaintiff's passengers' and others' speech as well.

### FIFTH CLAIM
### FALSE ARREST AND UNREASONABLY EXCESSIVE DETENTION

86.    Plaintiff repeats and re-alleges each of the preceding allegations contained in this Complaint with the same force and effect as if fully set forth herein.

87.    Plaintiff's allegations support a Fourth Amendment and Fourteenth Amendment unreasonably excessive detention claim and a false arrest claim.

88.    As to the false arrest claim, Plaintiff alleges, as stated above, that Defendants wholly lacked probable cause to arrest him at any point because he did not possess a gravity knife or commit any of the alleged traffic violations that Defendants alleged as the after-the-fact justification for the initial stop.   Nonetheless, Defendants arrested Plaintiff without privilege,

24

meant to do so, Plaintiff did not consent at any stage, and Plaintiff was aware of his unlawful confinement throughout.

89.    Assuming arguendo that Defendants could claim some articulable reason to stop, detain, search or arrest Plaintiff, which Plaintiff denies, Plaintiff alleges that his detention was unreasonably excessive and for reasons constitutional law disallows. As detailed herein and above, Plaintiff alleges that plainclothes Defendants' stop, detention, search, interrogation and arrest of Plaintiff was meant as an unprivileged investigative effort relating to offenses about which Plaintiff knew nothing, which Defendants knew.

90.    Defendants' unlawful actions, which were committed under color of state law, were done willfully, knowingly, with malice and with the specific intent to deprive Plaintiff of his constitutional rights.

91.    Defendants false arrest and unreasonably excessive detention of Plaintiff caused Plaintiff the injuries as referenced in this pleading.

## SIXTH CLAIM
## FAIR TRIAL AND FABRICATION OF EVIDENCE

92.    Plaintiff repeats and re-alleges each of the preceding allegations contained in this Complaint with the same force and effect as if fully set forth herein.

93.    Defendants' fabrication of evidence and making of false statements (including the omission of material information) regarding Plaintiff and the incident, which they then forwarded to the DA's Office, deprived Plaintiff of his right to fair trial.

94.    Defendants' unlawful actions, which were committed under color of state law, were done willfully, knowingly, with malice and with the specific intent to deprive Plaintiff of his constitutional rights.

95.    Defendants' fabricated evidence, false statements and/or omitted information (collectively "fabricated evidence") as forwarded to the DA's Office in support of Plaintiff's

arrest charges would be found material by a jury deliberating about Plaintiff's guilt or innocence relative to the same.

96.     In addition to Individual Defendants' knowingly forwarding substantive, material fabricated evidence in support of arrest charges against Plaintiff, Individual Defendants also forwarded material fabricated evidence to the prosecutor relating to the circumstances surrounding the incident bearing on the admissibility of the fabricated evidence. For example, and as alleged above and here, Defendants knew that fabricated evidence about Plaintiff's statements and about Defendants' claimed justification for and timeline relating to their search of Plaintiff and his vehicle was material and exculpatory, yet Defendants forwarded fabricated evidence about these subjects to prosecutors.

97.     Individual Defendants' unlawful actions, which were committed under color of state law, were done willfully, knowingly, with malice and with the specific intent to deprive Plaintiff of his constitutional rights.

98.     As a direct and proximate result of Defendants' unlawful conduct, Plaintiff sustained the damages hereinbefore alleged.

## SEVENTH CLAIM
## FAILURE TO INTERVENE

99.     The Individual Defendants actively participated in the aforementioned unlawful conduct and observed such conduct, had reasonable opportunity to prevent such conduct, had a duty to intervene and prevent such conduct, and failed to intervene.

100.     For certain Individual Defendants, whom on information and belief were Donohoe and Vaughan, their failure to intervene is demonstrated by Plaintiff's allegation that they stated aloud that the gravity knife did not meet the statutory definition yet they nonetheless committed and/or failed to intervene to prevent the commission of the violations described in this pleading.   Discovery will reveal the direct tortfeasors and Plaintiff will clarify his failure-to-

intervene claims, here pleaded in the alternative, when appropriate and when fuller information permits.

101.    Accordingly, the Individual Defendants who failed to intervene violated the First, Fourth, Fifth, Sixth and Fourteenth Amendments of the United States Constitution.

102.    Individual Defendants' unlawful actions, which were committed under color of state law, were done willfully, knowingly, with malice and with the specific intent to deprive Plaintiff of his constitutional rights.

103.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiff sustained the damages hereinbefore alleged.

## EIGHTH CLAIM
## MONELL

104.    Plaintiff repeats and re-alleges each of the preceding allegations contained in this Complaint with the same force and effect as if fully set forth herein.

105.    Defendants, collectively and individually, while acting under color of state law, engaged in conduct that constituted a custom, usage, practice, procedure or rule of the respective municipality/authority, which is forbidden by the United States Constitution.

106.    The aforementioned customs, policies, usages, practices, procedures and rules of Defendant City of New York and the NYPD included, but were not limited to, those pleaded in Paragraphs 37 to 66. Among other things, these include inadequate screening, hiring, retention, training and supervising of its employees that was the moving force behind the violation of Plaintiff's rights as described herein. As a result of the failure of the Defendant City of New York to properly recruit, screen, train, discipline and supervise its officers, including the Individual Defendants, Defendant City of New York has tacitly authorized, ratified and has been deliberately indifferent to, the acts and conduct complained of herein.

107.    The aforementioned customs, policies, usages, practices, procedures and rules of Defendant City of New York and the NYPD included, but were not limited to: turning a blind eye to gravity-knife misidentifications; arresting innocent persons in order to meet "productivity goals," or arrest quotas; arresting individuals for professional advancement, overtime compensation, and/or other objectives outside the ends of justice; and/or manufacturing false evidence against individuals in an individual effort and also in a conspiracy to justify their abuse of authority in falsely arresting, unlawfully stopping and maliciously prosecuting those individuals.

108.    The foregoing customs, policies, usages, practices, procedures and rules of the Defendant City of New York and the NYPD constituted deliberate indifference to Plaintiff's safety, well-being and constitutional rights.

109.    The foregoing customs, polices, usages, practices, procedures and rules of Defendant City of New York and the NYPD were the direct and proximate cause of the constitutional violations suffered by Plaintiff as described herein.

**PRAYER FOR RELIEF WHEREFORE**, Plaintiff respectfully requests the following relief:

A. An order entering judgment for Plaintiff against Defendants on each of his claims for relief;

B. Awards to Plaintiff for compensatory damages against all Defendants, jointly and severally, for their violation of Plaintiff's First, Fourth, Fifth, Sixth and Fourteenth Amendment rights, the amount to be determined at jury trial, which Plaintiff respectfully demands pursuant to FRCP 38;

C. Awards to Plaintiff of punitive damages against Defendants on the basis of their conscious wrongdoing and callous indifference to Plaintiff's constitutional rights and welfare, the amount to be determined at jury trial, which Plaintiff respectfully demand pursuant to FRCP 38;

D. Awards to Plaintiff of nominal damages against Defendants on the basis of constitutional violations herein alleged in the event that compensatory and/or punitive damages are unavailable on certain claims;

E. Awards to Plaintiff of the costs of this action, including reasonable attorneys' fees;

F. Such further relief as this Court deems just and proper.

DATED:     May 29, 2018
              New York, New York

Ryan Lozar (RL0229)
305 Broadway, 10th Floor
New York, New York 10007
(310) 867-1562

*Attorney for Plaintiff Jacques Langford*